NORTH AMERICAN UNION *v.* OLIPHINT.

Opinion delivered December 22, 1919.

1. INSURANCE — FOREIGN FRATERNAL BENEFIT SOCIETY — SERVICE OF PROCESS.—A foreign fraternal benefit society doing business in the State in violation of Acts 1917, page 2087, is estopped to deny that it had a license or that the Insurance Commissioner was its agent for the service of process.

2. INSURANCE—FOREIGN SOCIETY DOING BUSINESS IN STATE.—A foreign fraternal benefit society which took over the membership of another society doing business in the State, adopted the local organizations of the latter society, attached riders to the policies of members, assuming liabilities thereunder, levied and collected premiums and dues on such policies, paid losses, and directed representatives of the merged society to solicit insurance, was "doing business" in the State, within the meaning of Acts 1917, page 2087, relating to service of process on foreign benefit societies.

3. CONTINUANCE—SURPRISE.—In an action on contract it was not error to refuse a continuance asked by defendant on the ground the plaintiff changed the theory of his case at the trial, in that the complaint alleged a direct contract while the proof tended to show subsequent ratification of an unauthorized contract, since the alleged contract rested in correspondence which defendant's counsel obtained in advance of the trial.

4. INSURANCE—AGREEMENT TO PAY AGENT.—Letters *held* to indicate an intention to remunerate an agent for services rendered and to be rendered.

5.  INSURANCE—RATIFICATION OF CONTRACT OF EMPLOYMENT.—Letters written by a fraternal benefit association *held* sufficient to support a finding that such association ratified a contract of an association of members of such association undertaking to bind such association to pay plaintiff for services rendered and to be **rendered.**

6.  TRIAL—INSTRUCTION.—An instruction, "If you further find, from a fair preponderance of the evidence and under all the circumstances of the case as reflected by the evidence, that the services, if any, were of such a nature as to lead to a reasonable belief that it was the *understanding* of the parties that a pecuniary compensation should be made for them, then you would be warranted, under the law,' in finding there was an implied promise on the part of the defendant to pay the plaintiff in money for any such services," *held* not erroneous, as in effect instructing the jury to determine whether there was an implied contract from the character of the services rendered, and not from the whole evidence in the case.

7.  TRIAL—REQUESTS ALREADY COVERED.—It was not error to refuse a requested instruction fully covered by given instructions.

8.  TRIAL—AMBIGUITY IN INSTRUCTION.—Any mere ambiguity in an instruction should be specifically pointed out to the court or met by a correct request eliminating the ambiguity.

Appeal from Pulaski Circuit Court, Third Division; *G. W. Hendricks,* Judge; affirmed.

*Sherrill, Buchanan & Mallory,* for appellant.

1.  Proper service was not had on appellant. Sec. 17, act 462, Acts 1917; 69 Ark. 429-396. The summons was served upon the State Insurance Commissioner and J. L. Hawkins, an alleged collector for defendant, but not an agent for service. 69 Ark. 429, 396; 251 Fed. 171; 251 *Id.* 71. The doctrine of estoppel does not apply here. 1 Herman on Estoppel, p. 14; 218 U. S. 573. Defendant was not doing business in Arkansas nor engaged in business in the State. 177 U. S. 28-45; 204 *Id.* 21-22; 218 *Id.* 573.

2.  The court erred in refusing to permit defendant to introduce evidence on motion to quash service. 218 U. S. 573; 134 Am. St. 879; 197 N. Y. 279.

3  A continuance should have been granted, and it was error to refuse it. Defendant was a foreign corpo-

ration and had no witnesses present and was taken by surprise.

4.    Plaintiff failed to make out a case of ratification. 166 Fed. 944; 78 N. J. L. 637; 76 Atl. 1024; 121 Cal. 55-63-4; 108 Me. 83-4; 66 Mo. App. 643-6; 32 Pa. 340, 347-8; 3 Daly (N. Y.) 98-100; 16 Cal. 591.

5.    No agreement was made with plaintiff by any one to pay him a monetary commission or consideration, as the evidence shows.

6.    The court erred in giving instruction No. 3 for plaintiff but should have given a directed verdict for defendant. It erred also in giving Nos. 8 and 9 and 10. The instructions are confusing and ambiguous.

*Moore, Smith, Moore & Trieber* and *Gardner K. Oliphint,* for appellee.

1.    The court had jurisdiction over defendant. The motion to quash the service only stated conclusions without setting up facts to sustain it; it attacked the jurisdiction over the person of defendant and not the subject-matter and the proof showed that defendant was doing business within this State, both generally and specially, and is estopped. 219 Fed. 96; 104 N. W. 1054; 1 Fed. 471; 140 *Id.* 921; 95 Ark. 302, 307; 19 Okla. 115; 39 *Id.* 629; 60 Ark. 578; 56 *Id.* 539-541. Here service was had under act 462, Acts 1917.

2.    The court properly refused to hear evidence on motion to quash, as the motion was not proper, and did not state facts.

3.    No error in refusing a continuance. 214 S. W. 1.

4.    The implied agreement to pay plaintiff for his services was ratified as soon as the parties who made the agreement obtained control of the defendant.

5.    There was an implied agreement to pay plaintiff in money and there is no error in the instructions. 6 R. C. L. 587; 56 Ark. 382; 82 *Id.* 136.

Humphreys, J.    Appellee instituted suit against appellant in the Third Division of the Pulaski Circuit Court to recover $800 on account of alleged services ren-

dered by him to appellant from September 1, 1917, to May 1, 1918, for the stipulated amount of $100 per month, and on a second count in the complaint claimed the same amount upon a *quantum meruit* for services rendered during said period.

Appellant, specially appearing, filed a motion to quash the service upon the ground, among others, that it was a foreign corporation, incorporated under the laws of Illinois, to do a fraternal insurance business, and that neither at the time service was had upon the Arkansas State Insurance Commissioner nor at any time prior thereto had it taken out a license to do business in Arkansas, nor had it done an insurance business in the State in violation of the law, by failing to appoint the Insurance Commissioner as its agent upon whom service might be had. This motion was overruled by the court, over the objection of appellant; whereupon appellant, reserving its rights raised by the motion to quash, filed an answer, denying its liability on account of service rendered, as alleged.

The cause was submitted to a jury upon the pleadings, exhibits, the evidence and depositions of witnesses and exhibits introduced and attached, and the instructions of the court, upon which a verdict was returned in favor of appellee for $500. A judgment was rendered in accordance with the verdict, from which an appeal has been duly prosecuted to this court.

The evidence revealed that appellant was a fraternal benefit society, organized under the laws of Illinois, and doing a fraternal insurance business in Illinois and other States, with headquarters at Chicago. The Knights and Ladies of Honor was an Indiana corporation of the same character, licensed to do business in Arkansas, and which maintained local organizations in the latter State. On or about August 1, 1916, the Knights and Ladies of Honor became insolvent, and its organizations and business were taken over by appellant. Appellant assumed the liabilities of the policies of the Knights and Ladies of Honor in Arkansas and issued riders to the members in Arkansas to be attached to their policies in the Knights and Ladies of

Honor. The premiums and dues of the Knights and Ladies of Honor were thereupon forwarded to the North American Union. In the month of December, following, appellant and the Fraternal Aid Union, another organization of the same character, entered into a merger which also included the organization and business of the Knights and Ladies of Honor. At the time of the first merger, appellee was working for the Knights and Ladies of Honor at a salary of $100 per month, but, after the merger, was retained in the same capacity by appellant at the same salary until its union with the Fraternal Aid Union, and, after the second union, or merger, appellee was retained by the Fraternal Aid Union until the first of September, 1917, in the same capacity and at the same salary. Under the last merger, the business of the three organizations was conducted as one business under the name of the "Fraternal Aid Union." During the month of June, 1917, members, who had formerly had control of the business of the North American Union, organized themselves into the "Policy Holders' Protective Association" of the North American Union, and procured the institution of a suit in Chicago for the purpose of dissolving the merger between appellant and the Fraternal Aid Union, and reclaiming the organization known as the North American Union, together with its fund which had passed into the hands of the Fraternal Aid Union. The issues, as finally joined in the suit attacking the validity of the merger between the North American Union and the Fraternal Aid Union, also involved the validity of the merger between the Knights and Ladies of Honor and the North American Union. During the time the Policy Holders' Protective Association was aiding in the prosecution of the suit, the members which organized it secured a meeting of the Supreme Council of the North American Union, and elected Henry J. Beecher, president, C. A. Gillespie, secretary, Daniel S. Wentworth, general counsel, H. A. Correa, superintendent, and C. C. Nunemaker, committeeman of the State of Order. They began to operate the business of the North American Union

under their official titles, but were restrained from conducting any business during the pendency of the suit. The same parties then opened an office in Chicago and conducted the business of the North American Union under the name of Policy Holders' Protective Association. The chief business conducted by them during that period consisted in writing letters and sending out literature concerning the great merit of and benefit to be derived from remaining with the North American Union, and advising all members and local organizations to withdraw their influence and contributions from the Fraternal Aid Union and to render both to the North American Union. The method advised and most generally adopted was to secure resolutions from local lodges, expressing allegiance to the North American Union and to send all monthly dues to it in Chicago, as well as to make voluntary donations for temporarily maintaining the organization and carrying on the litigation. On August 29, 1917, either before or just about the time the injunction against appellant, as reorganized, became effective, a letter was written to appellee by Henry J. Beecher, supreme president, on a letter-head carrying the names of the respective officers and the following inscription:

"North American Union,
"A Northwestern Reserve Fund Insurance Association."

In part the letter read: "We can assure you that, as soon as the organization is restored to its membership and is allowed to use the general funds of the order, we will not forget those who have been loyal to us, and we sincerely believe that time is not far off." After the injunction became effective and until dissolved, the letterheads were as follows:

"Policy Holders' Protective Association
North American Union
"A Northwestern Reserve Fund Insurance Association."

The general trend of the letters written to appellee by the Policy Holders' Protective Association was in the nature of approvals of work appellee had done toward holding the local organizations in Arkansas in the North

American Union, and requests for continued diligence, and directions as to methods of procedure, etc. The following excerpts are taken from letters written by D. S. Wentworth, C. G. Nunemaker, H. A. Correa and Henry J. Beecher, prior to the dissolution of the injunction.

September 18, 1917. "I am sorry to say that just at the present time we could not guarantee anything, but we have constantly before us the intelligent and loyal work you are doing for the N. A. U., and when the proper time comes you need not worry about being compensated for time and trouble so nobly rendered in this cause. Keep up the good work, and, as previously stated, we will take care of you. It is impossible, with our limited help, to write each and every individual council or member, but are trying to keep you posted through bulletins and circulars."

September 27, 1917. "At once get in touch with all of your friends and have them hold the K. & L. of H. members in your State for the N. A. U. We are going to rely upon you to do this for us in your State, and we will see that you are taken care of. Get right down to brass tacks now, circulate this good news," etc.

September 29, 1917. "I am enclosing herewith copies of part of the proceedings of the demurrer recently heard before Judge Pinkney. Kindly call on your different papers and see if you can get them to print as much of the article as possible in your daily papers, as it will undoubtedly help our cause."

October 9, 1917. "All the former K. & L. of H. councils have to do to remain with the North American Union is to send their remittances to this office and ignore the F. A. U. You do not have to do another thing, we will take care of the balance of matters for you and your council, so get busy at once and see that your assessments are sent to Mr. Chas. P. Crance, supreme treasurer, at the above address. Your work now lies in having the councils who desire to remain North American Union write here and the best way we will have of judg-

ing your work will be by the number of remittances we receive from Arkansas.''

October 11, 1917. ''I am very pleased to hear that Mimosa Council will stand back of their promises, and will prove their loyalty by remitting to this office.''

October 15, 1917. ''I also have your letter of October 13, enclosing the strong resolutions of Mimosa Council No. 203, for which kindly accept thanks. I am having the resolutions of Mimosa Council copied and will enclose them in a letter to each and every council in the State of Arkansas, and hope you will be able to follow them up and get results.''

October 19, 1917. ''Practically every council, whether K. & L. of H. or otherwise, that we have gone after, we have landed back into the fold, and by placing the true facts before the members there is no reason why you can not do the same. Give me a history of the various councils you are working on, so that I may keep informed as to their standing and condition. If possible, get me a list of their membership as to amount of insurance carried and dues paid.''

. October 29, 1917. ''It gives me great pleasure to be able to say that we are today in receipt of a telegram from the Fraternal Aid Union stating that they have agreed to accept our terms of compromise. All it will be necessary for any council to do to remain with the N. A. U. is to make their monthly remittances to this office the same as your council has been doing.''

October 31, 1917. ''All that is necessary for any council to do to remain with this order is to make their monthly remittances to us, regardless of whether or not they have signed riders.''

The suit involving the validity of the merger was compromised and the injunction dissolved on November 7, 1917. The decree restored the North American Union to its original status, recognized as legal the board of officers elected at the preceding August meeting, returned its assets and permitted it to obtain such of the membership of the Knights and Ladies of Honor as chose

to affiliate with it. Thenceforth, the business was conducted by the recognized officers in the name of the North American Union. In the conduct of the business, it continued to levy and collect dues from the membership of the Knights and Ladies of Honor in the State, organized under the name of Mimosa Lodge, and also from the local lodge at Conway, until the summer of 1918. The letters written by appellant to appellee, after the dissolution of the injunction, were in commendation for loyal services rendered the appellant during the litigation and in requests for a continuation of his services in the future. In a letter of date November 9, appellant said: "Am advised that you were informed of the good news that our grand old order has been restored, and pleased that Mimosa council has cast her lot with such a worthy order as the N. A. U. has been, and still remains a great deal better through our reprehensible officers being removed. Spread the good news broadcast among all of your members and satisfy them that the N. A. U. has come to stay."

Of date November 12, said: "The K. & L. of H. members are to be allowed to decide for themselves where they want to go, and the F. A. U. have a right to present their side, and it will be up to you, if you desire the members to stay in N. A. U. to present the N. A. U. side of the case. As soon as proofs of death are received, we will see that they are given prompt consideration so as to give you advertising. Kindly see that the papers are correct and will not have to be returned for corrections."

Of date November 22, said: "We are sending, under separate cover, marked copy of the January, 1916, issue of the Western Review. The article referred to is in the form of editorial comment on the subject of merger, and gives court opinions, a study of which may give you some talking points to be used in making your council visitations."

Of date of November 27, said: "Shortly after the first of the month you will receive our December issue of the North American Union News, which will set forth our financial standing, also rates, etc., for new members. You

will be sent sufficient supply for distribution among all your friends. If you can use to good advantage any more copies of the decree, kindly let me know, and we will forward same.''

Of date December 12, said: ''Glad you are going to see that only loyal members are elected to official positions through the ensuing year. Without good loyal officers we cannot expect to obtain any degree of success. *In re* the claim of the late Richard T. Johnson, will say that this is now in the hands of our investigating department, and, as quickly as they pass upon same, it will be paid.''

And of date December 22, said: ''I have asked another organization, of which I am the legal adviser, to-wit, the Degree of Honor, to write to you so that you might investigate and see whether or not you could get more advantages out of that society than you could out of the N. A. U. for the reason that the Degree of Honor has some thirty councils in your State. If upon investigation you find that they can, then they are to make a proposition worth your while. You have been faithful and true to the N. A. U. and we intend to stand by you, but our membership in Arkansas will be so small that we will not be able to give it the attention you desire, and there will probably be delays in the payments of claims, as in the Johnson case, and therefore there would be no advantage to your membership to belong to an organization that is not fully organized in your State. If, when you have looked into it and find you cannot make arrangements, the N. A. U. will stand behind you as you did for it.''

And of date December 22, said: ''According to your records, I find your lodge, with 120 members, and Conway with 10, making a total of 130 members, are the only ones that voluntarily elected to remit to this office and remain with the N. A. U. If I were you, I would write to Mrs. Olson and find out all about her State organization in Arkansas, what she can offer you personally for such services as you might render, and then think the matter over.

carefully. I would not be in any hurry, because you are protected in the N. A. U. and will be protected. We do not want you to think we are trying to cast you adrift, now that we have come out of the litigation successfully, but we want you to consider that we are not going to be selfish in the matter, and are going to allow you to enjoy the fruits of victory as well as ourselves, and to have the option of placing your organization where it will have not only adequate insurance protection, but also will get the best benefits from a social point of view.''

And on December 28, said: ''I am enclosing to you under separate cover a few advance copies of our January issue and refer you to page 8, wherein you will find the financial statement. I hope that you will get these advanced copies where they will do the most good, especially among the desirable K. & L. of H. members who desire information as to the true facts.''

And on January 4, 1918, said: ''We have, however, conceived of this plan—that we send you, under separate cover, some fifty application blanks, and if you can secure any business, you have the applicant write to this office, enclosing his application, and we will register him in our Union Council No. 17. When everything has been adjusted in Arkansas, we will transfer the members to your council. We hope that you will be able to do some business for us along this line, for no insurance company can live without new business, and if we have 130 members in Arkansas, we should try and have at least fifty new applications written, in order to make up for the thirteen months that no new business has been written. In writing this business, under present conditions, we prefer you to get as young people as you can. We are accepting business from sixteen years up. The younger business we get, the better it will be for us as to our average age, and under the war conditions, women are a better risk than men between 21 and 31, unless they have been exempted from the draft.''

We have selected from the correspondence such extracts as most strongly tend to establish an implied con-

tract for services entered into between the Policy Holders' Protective Association and appellee, because it is contended by appellant that, after resolving every favorable inference deducible from the evidence in favor of appellee, there is not sufficient upon which to sustain the finding of an implied contract between the Policy Holders' Protective Association and appellee, and a subsequent ratification thereof by appellant.

It is first insisted by appellant that the court erred in refusing to quash the service of summons upon it. The summons was served upon the State Insurance Commissioner, under act 462, Acts of the General Assembly of 1917. That act requires fraternal benefit societies, as a prerequisite to obtaining a license to do business in the State, to appoint the Superintendent of Insurance its agent upon whom legal process might be served. No such appointment was made; hence appellant had no license to do business in the State. It follows that the Superintendent of Insurance was not appellant's agent, upon whom service might be had, and the service was invalid, unless appellant is estopped to deny service by having done business in the State in violation of the statute. If appellant was doing business in the State, it was violating the statute, and is estopped to deny that it had a license or that the Superintendent of Insurance was its agent for purposes of service. *Masons' Fraternal Accident Assn.* v. *Riley,* 60 Ark. 578; *Vulcan Construction Co.* v. *Harrison,* 95 Ark. 588; *Ehrman* v. *Teutonia Insurance Co.,* 1 Fed. 471; *Mutual Reserve Fund Life Assn.* v. *Phelps,* 190 U. S. 147; *Old Wayne Mutual Life Assn. of Indianapolis* v. *McDonough,* 204 U. S. 8. We think taking over the membership of the Knights and Ladies of Honor, adopting the local organizations of this order as its local organizations, attaching riders to the policies of the members of the Knights and Ladies of Honor, thereby assuming liabilities under the policies, levying and collecting premiums and dues on the policies, paying losses, and directing its representative to solicit insurance, constitute a doing of business in the State under the statute. The court did not err in overruling the motion to quash the service.

It is next insisted that the court erred in refusing to grant appellant a continuance in the cause. The ground upon which the insistence is based is that appellee changed the theory of his case at the commencement of the trial, to the surprise and prejudice of appellant. The suggested change in theory is that the complaint alleged a direct contract, whereas the proof tended to show the subsequent ratification of an unauthorized contract and that it was prejudiced because it had only taken proof to meet the issue tendered in the complaint. It is true the complaint alleged an agreement between appellant and appellee, but the validity of the contract rested entirely upon correspondence which counsel for appellant obtained in advance of the trial. It is also true some of the letters were written by appellant on stationery bearing appellant's letterhead, but many of them were written by the Policy Holders' Protective Association, which assumed to act for appellant, as indicated both by the letterhead and contents of the letters. With this information in hand, appellant was not warranted in assuming that only such letters as were written by appellant itself would be relied upon to establish the contract. The whole correspondence was submitted by appellant as establishing the contract pleaded and relied upon for recovery. With this information in advance, neither surprise nor prejudice resulted to appellant in denying its request for a continuance.

It is next insisted that the letters written by the Policy Holders' Protective Association do not show an undertaking to pay a monetary consideration for the services of appellant. We think the language heretofore quoted from the letters of date August 29 and September 15, indicate a monetary consideration for services being, and to be, rendered, by appellee, as soon as appellant could regain its funds. The language employed, as well as the connection in which it was used, indicates an intention to reward loyal service by remuneration out of the general fund when recovered. It is also clearly inferable from the letters that, in response to a request and direc-

tion of the Policy Holders' Protective Association, appellee rendered loyal and valuable services to appellant in restoring its independence and regaining its fund.   It is contended, however, that, if the language of the letters sustain an implication to pay appellee for services in money, the letters written after the dissolution of merger and the restoration of appellant to an independent state are insufficient to establish a ratification of the contract. The extracts quoted in the statement of the case from the letters written by appellant after the dissolution of the injunction otherwise impress us.   We think the contents of the subsequent letters justify and support a finding that appellant subsequently ratified such contract as was made and entered into between the Policy Holders' Protective Association and appellee.

Instructions Nos. 1, 3, 8 and 9, requested by appellant and refused by the court, were predicated upon the theory that there was no evidence in the record tending to show an implied contract for services to be paid in money which was subsequently ratified by the North American Union.   In the discussion of whether there was sufficient legal evidence to support the verdict and judgment, this court ruled that it was inferable from the letters written by the Policy Holders' Protective Association to appellee that, for the loyal services being rendered and to be thereafter rendered to it and the North American Union, appellee should be remunerated whenever the fund of the North American Union was recovered by, or restored to, it.   The ruling on that point concludes the contention of appellant that the court committed error in refusing to give its requests, 1, 3, 8 and 9, aforesaid.

It is also insisted that the court erred in giving instruction No. 3, requested by appellee, which is as follows:  "With reference to the contention that plaintiff was to be paid, if at all, in new employment, and not in money, you are instructed that, if you find from a fair preponderance of the evidence that the plaintiff performed the services set forth in his complaint, that such services were rendered for and received and accepted by

the defendant, and if you further find from a fair preponderance of the evidence and under all the circumstances of the case as reflected by the evidence that the services, if any, were of such a nature as to lead to a reasonable belief that it was the understanding of the parties that a pecuniary compensation should be made for them, then you would be warranted, under the law, in finding there was an implied promise upon the part of the defendant to pay the plaintiff in money for any such services; but otherwise if you should find that there was an express contract to the contrary, or if you should find that the services were not of a nature leading to such a reasonable belief.'' The interpretation placed upon this instruction by appellant is that it in effect instructed the jury to determine whether there was an implied contract to pay for services in money from the character of the services rendered and not from the whole evidence in the case. We do not so interpret it. The very converse is true. Under a proper construction of the instruction, the jury was told that it was incumbent upon appellee, in order to recover, to show by a preponderance of all the evidence that it was impliedly understood by the parties that the services were to be remunerated in money and not in new employment; and that, before such an inference could be drawn, the nature of the services must be consistent with the inference. This was certainly the general intendment of the instruction, and, even if ambiguous in meaning, it cannot be said to be inherently erroneous. Any mere ambiguity carried in the instruction should have been specifically pointed out to the court or met by a correct request eliminating the ambiguity.

It is also insisted that the court erred in refusing to give appellant's requested instruction No. 10. We think it was fully covered by instructions Nos. 1 and 2, given by the court at the request of appellee, as well as by instruction No. 7, given by the court at the request of appellant. Being fully covered by other instructions, it was not error to refuse it, though a correct declaration of the law, as applicable to the facts.

Lastly, it is contended that the court erred in modifying appellant's eleventh request, by adding the following clause to it: "Or that the defendant duly ratified the same by knowingly accepting and retaining the benefits of such implied contract." It is conceded that the court intended, by inserting the word "knowingly" to convey the idea that appellant could not have ratified the contract without knowing the terms thereof, but that the clause in which the word "knowingly" was inserted is ambiguous and susceptible to a different meaning than that intended by the court. Reading the modified instruction as a whole, we do not think it ambiguous, but, if appellant is correct, it should have been met by a specific objection or a request for a correct instruction, which was not done.

No error appearing in the record, the judgment is affirmed.